W. B. QUARTON, Appellee, v. THE AMERICAN LAW BOOK CO., Appellant.

Contracts: SPECIFIC PERFORMANCE BY ASSIGNEE. The assignee of a contract has no greater right to a decree for its specific performance than his assignor would have had, had he brought the action in his own right.

Sales: CONTRACTS: DELIVERY AND PAYMENT BY INSTALLMENTS: BREACH BY BUYER: CANCELLATION BY SELLER. In the case of a contract for the sale of goods to be delivered and paid for in installments, and the buyer neglects or refuses to pay for one or more installments, the question of whether there has been such a repudiation of the whole contract by the buyer as to justify the seller in canceling it and refusing to make further deliveries depends upon the terms of the contract, whether divisible or entire, all the circumstances of the case and the conduct of the buyer with respect to the breach.

Contracts: BREACH: SUBSEQUENT OFFER TO PERFORM. The renuncia-

tion or abandonment of a contract by one of the parties may be treated by the other as terminating the agreement, although he is not bound to so treat it, but if the renunciation is regarded as a breach the party renouncing is not at liberty to withdraw the renunciation and offer to perform, although the actual time for performance has not expired.

Contracts: SALE ON INSTALLMENT PLAN: RENUNCIATION. Under a contract for the sale of goods to be delivered and paid for on the installment plan, generally speaking, a mere failure to pay for installments delivered will not authorize a repudiation of the contract by the seller; but where such failure to pay is accompanied by such circumstances from which it appears that the buyer intends to renounce and abandon the contract, the seller may repudiate it because of the breach.

Same: ABANDONMENT OF CONTRACT: CANCELLATION: ESTOPPEL: SPECIFIC PERFORMANCE. Plaintiff's assignor contracted for a set of law books to be delivered and paid for as the same were published. He received and paid for the first volume, but failed to make payment for the three succeeding volumes, which were delivered, and the seller made no further deliveries. The buyer failed even to respond to requests for payment made from time to time during the two years following, until finally the seller notified the buyer that the contract was canceled, to which no response was made. The buyer never at any time requested or demanded delivery of the remaining volumes, but after the lapse of over two years, assigned his contract to plaintiff, who paid for the volumes delivered and demanded performance. *Held,* that the buyer had abandoned the contract and the seller was justified in rescinding it, so far as it related to future deliveries; that the buyer was estopped from insisting on further performance, and that specific performance would not be ordered at the suit of his assignee.

*Appeal from Kossuth District Court.*—HON. D. F. COYLE, Judge.

FRIDAY, JULY 2, 1909.

SUIT in equity for the specific performance of a contract for the sale of books and for damages due to delay in filling the order. The trial court granted the prayer for specific performance and gave plaintiff judgment for

the sum of $50. Conditions were also made in the decree which need not be noticed at this time. Defendant appeals. —*Reversed.*

*Harrington & Dickinson* and *E. V. Swetting,* for appellant.

*J. L. Bonar,* for appellee.

DEEMER, J.—On or about March 17, 1901, one George E. Clarke entered into a written contract with the defendant, a law publishing house, which contract reads as follows: "The American Law Book Company, 120 Broadway, New York. Algona, Iowa, 3—17—1901. Please send me C. O. D., carriage paid, as published, the Cyclopedia of Law and Procedure, in (law sheep) binding, for which I agree to pay you $6.00 per volume upon delivery. The publishers guaranty to complete said work in not to exceed thirty-two Royal Octavo volumes, or to furnish free of charge any volumes in excess of that number necessary to complete the same. The publishers further agree to publish annual annotations to said work, which will keep the same up with the current decisions of the courts of last resort, and to furnish the said annotations to subscribers at the annual rate of twenty cents for each published volume of the Cyclopedia of Law and Procedure, and subscriber agrees to take said annotations at said price. All representations by agents, to be binding, must be written on the face of the contract. Subscribers may have either binding mentioned above. Erase the one not desired. [Signed] Geo. E. Clarke, Agent J. A. Yeager." Shortly thereafter the first volume of the work was published, and, pursuant to order, delivered to the purchaser, who paid for the same upon delivery. In the same year another volume was issued and delivered to Clarke, and in the year 1902 volumes three and four were issued and delivered. Pay-

ments were not made for these last three volumes, and defendant about July 18, 1902, wrote Clarke asking him to remit therefor, and advising him that from four to six volumes would be published each year. Hearing nothing from Clarke, defendant again wrote him about February 11, 1903, saying that if he could not pay for volume 2 they would accept his note for thirty days for the amount, and they inclosed note for him to sign. No response was received to this, and again on March 16, 1903, defendant wrote, saying that Mr. Clarke was owing $18 for volumes 2, 3 and 4, calling his attention to some promises he had made their representative, stating that they had paid a large advance commission on his order, and had themselves to that date received nothing. Receiving no response to this or to former letters, defendant on November 11, 1904, again wrote Clarke, stating that as they had had no responses to their former letters, and as he had failed to meet his payments as provided in his contract, they from that date considered his contract null and void. On the same day they wrote upon the face of the contract in red ink, "Canceled November 11, 1904," and made the same notation upon their subscription registers after Clarke's name. Nothing was ever heard from Clarke in response to any of these demands, notifications, or requests.

In the later part of the year 1904, defendant enlarged the number of volumes which it proposed to issue from thirty-two to thirty-six and in January of the year 1906 again raised the number from thirty-six to forty and advanced the price from $6 to $6.50 per volume, and on June 1, 1907, it increased the price from $6.50 to $7 per volume. About January 1, 1907, Clarke orally assigned his contract to the plaintiff herein. Some time in December of the year 1906, defendant placed its claim for the $18 against Clarke in the hands of a mercantile agency for collection, and a local attorney for said agency at Algona, Iowa, presented the same to Clarke. We now quote from

the agreed statement of facts upon which the case was tried, as follows:

That said Swetting [the local attorney] made demand upon Geo. E. Clarke for the payment of said $18 on account of volumes two, three and four of Cyc., and on or about January 5, 1907, the plaintiff herein paid said bill to E. V. Swetting, and took a receipt therefor, showing the payment by Geo. E. Clarke of volumes two, three and four of Cyc., and the plaintiff herein, at the time of paying the $18 to the said E. V. Swetting, demanded of the said E. V. Swetting that he furnish the balance of the volumes of the Cyc. then published, and offered to pay therefor in cash under the terms of the Clarke contract. That the said E. V. Swetting conveyed said request and demand to Wilber Mercantile Agency, and said Wilber Mercantile Agency conveyed said demand and request to the defendant herein, and the defendant refused to furnish any additional volumes to the plaintiff herein, or to Geo. E. Clarke under said contract with the said Geo. E. Clarke entered into in 1901. That on January 5, 1907, W. B. Quarton, for himself and Geo. E. Clarke, paid to E. V. Swetting for and on behalf of the defendant $18 for volumes two, three and four of said Cyclopedia of Law and Procedure.

Defendant at all times refused to deal with plaintiff as an assignee of the contract, claiming that it had been canceled and annulled, and that in no event was it assignable by Clarke to any other person. This action was commenced December 5, 1907, and upon trial plaintiff was granted the relief prayed. For a reversal appellant contends: That the contract was not assignable; that it was cancelled and forfeited before the attempted assignment was made; that Clarke, the assignor, by reason of his conduct after notification from defendants of the cancellation of the contract, is barred and estopped from enforcing the said contract; and that plaintiff is not entitled to damages for defendant's failure to deliver subsequent volumes.

Upon some of these propositions there is a decided

conflict in the authorities. We shall assume that under our statute (Code, section 3044) the contract in suit was as-

*1. CONTRACTS: specific performance by assignee.*

signable; but the assignee of such contract has no greater rights under the assignment than his assignor would have had, had he brought the action in his own name and right. *Steele v. Mills,* 68 Iowa, 406; *Miller v. Hansen,* 104 Iowa, 307.

What, then, would have been the situation of Clarke had he attempted to enforce the contract in view of the facts above recited? Plaintiff claims: That the contract was never forfeited; that it could not have

*2. SALES: contracts: delivery and payment by installment: breach by buyer: cancellation by seller.*

been forfeited, although Clarke had failed, neglected, and refused to pay for the books already delivered to him; that, in receiving pay for the books already delivered, the con-

tract was restored; and that, after such restoration, Clarke might have enforced the same by a suit either at law or in equity. The exact point here is that, where there is a contract for the sale of goods to be delivered in installments which are to be separately paid, and the buyer neglects or refuses to pay for one or more installments, there is no such renunciation or repudiation of the whole contract as justifies the seller in canceling or avoiding it. Upon this proposition the English decisions are in conflict, and the courts of our own country are not agreed. See: *Withers v. Reynolds,* 2 Barn. & Ald. 882; *Hoare v. Rennie,* 5 Hurl. & N. 19; *Honck v. Muller,* 7 Q. B. Div. 92. *Contra*: *Jonassohn v. Young,* 4 Best. & S. 296; *Simpson v. Crippin,* 8 Q. B. (L. R.) 14. Also: *Norrington v. Wright,* 115 U. S. 188 (6 Sup. Ct. 12, 29 L. Ed. 366); *Pope v. Porter,* 102 N. Y. 366 (7 N. E. 304); *King v. Slater,* 12 R. I. 82 (34 Am. Rep. 603); *Rugg v. Moore,* 110 Pa. 236 (1 Atl. 320); *Robson v. Bohn,* 27 Minn. 333 (7 N. W. 357); *Providence Coal Co. v. Coxe,* 19 R. I. 380 (35 Atl. 210). Opposed: *Bollman v. Burt,* 61 Md. 415; *Blackburn v. Reilly,* 47 N. J. Law, 290 (1 Atl. 27, 54

Am. Rep. 150); *West v. Bechtel,* 125 Mich. 144 (84 N. W. 69, 51 L. R. A. 791). See, also, a valuable review of the subject in Williston on Sales, section 467. Our own cases seem to hold that a failure to pay an installment or installments does not give the seller the right to treat the whole contract as repudiated. *Myer v. Wheeler,* 65 Iowa, 390; *Hansen v. Heating Co.,* 73 Iowa, 77.

In view of the full discussion contained in the authorities cited it is useless to review all of them, for, after a careful examination of the different opinions, we are constrained to hold that the following section of what is known as the "sales act," adopted by Great Britain in the year 1903 (St. 55 & 57, Victoria, chapter 71, section 31), and by several states of our own country since, announces the true weight of American authority: "It depends in each case on the terms of the contract whether the breach of contract is so material as to justify the injured party in refusing to proceed further and suing for damages for breach of the entire contract, or whether the breach is severable giving rise to a claim for compensation but not a right to treat the whole contract as broken." See, also, sales act prepared by the American commission of which Hon. Amasa Eaton is president.

Story, in his work on Sales (2d Ed.), said with reference to this subject:

Sec. 244. So, also, where an indefinite quantity or mass is sold at a certain price per measure, upon a warranty that it is of a certain quality, it would seem that the contract would be entire for each measure only, and severable in respect to the whole quantity, so that the vendee would be obliged to take so much as corresponded to the warranty; that is, it would seem to be an agreement to pay so much per measure for as much as satisfied the whole terms of the contract. If, indeed, in such a case, there be a special agreement to take the whole quantity or nothing, it constitutes an essential consideration of the purchase, and the parties would be bound to abide by such agreement.

So, also, if the agreement were absolutely and uncondi-
tionally to take the whole of an indefinite quantity, without
any warranty of quality, at a certain price per measure,
the contract would be considered as an entirety; the meas-
ure being considered as a mere means of estimating the
gross sum which should be paid. And the distinction be-
tween the cases where an indefinite quantity is actually
bargained for, upon a warranty, and where the whole is
bargained for absolutely and without condition, is that in
the latter case the taking of the whole is absolute, and
makes a necessary part of the contract; while, in the form-
er case, the taking of the whole depends upon a condition,
namely, that the whole shall comply with the warranty. If
it do comply with the warranty, the contract is entire.
But, in case of a failure of warranty, the contract would
be several, inasmuch as its very terms import a merely con-
ditional sale of the whole, so that, if the condition be not
performed, the contract is modified and altered, and, also,
because its terms afford a means of exactly estimating the
value of the portion taken. But if there be no warranty,
and no condition broken, the contract must be considered as
entire and indivisible. Analogous to these cases is the case
where a horse dealer sold two horses for one entire price,
and warranted both to be sound; and it was held that, as
respected the warranty, the contract was several, and that
the vendee was not obliged to keep the horse which did not
answer to the warranty.

Sec. 244(a). In the diversity of the cases upon this
subject, it is difficult to lay down any clear rule. The dis-
tinctions adverted to are the only means that suggest them-
selves to reconcile the cases; but, upon the whole, the weight
of opinion and the more reasonable rule would seem to be
that where there is a purchase of different articles, at dif-
ferent prices, at the same time, the contract would be sev-
eral as to each article, unless the taking of the whole was
rendered essential either by the nature of the subject-mat-
ter, or by the act of the parties. Where a bill of parcels
is taken, and includes the articles bought, under one whole
price, it would, if accepted, afford evidence of an intention
by both parties to treat the contract as entire. And wher-
ever the failure as to a part would materially defeat the
objects of the contract, and would have affected the sale,

had such failure been anticipated, the contract would be entire. This rule would found the interpretation of the contract on the intention of the parties, as manifested by their acts, and by the circumstances of the case. Of course, if two articles be bought at the same time, under the agreement that one may be returned if it do not prove satisfactory, there would be no entirety of contract.

The true rule, as we understand it, was announced by Lord Selborne in *Mersey Steel Co. v. Naylor*, 9 App. Cas. 438, as follows: "You must look at the actual circumstances of the case in order to see whether the one party to the contract is relieved from its future performance by the conduct of the other. You must examine what that conduct is, so as to see whether it amounts to a renunciation, to an absolute refusal to perform the contract, such as would amount to a rescission if he had the power to rescind, and whether the other party may accept it as a reason for not performing his part."

In the American notes to Benjamin on Sales (6th Ed.) 568, it is said:

On the other hand, there is abundant authority in America, as in England, that, if the buyer not only refuses to pay for one installment, but puts his refusal on such ground as justifies the inference that he repudiates the entire contract, or insists upon new terms different from the original agreement, the vendor may be released from any subsequent delivery. Thus in *Stephenson v. Cady*, 117. Mass. 6, C. sold S. two lots of yarn, by two successive agreements, payable on delivery, and by the terms of the contracts the delivery under the second was to commence when all had been shipped under the first. The whole of the first having been delivered and payment demanded, S. refused to pay 'unless C. would give security for the entire fulfillment of the contracts,' which C. declined to do, and did not ship any under the second agreement. Held, that S.'s refusal to pay for the yarns on the ground stated would justify the inference that he did not himself intend to be bound by the original contract, and so he could

not hold the other liable for noncompletion of it. *Curtis v. Gibney,* 59 Md. 131, is much like it. So a refusal to pay for one installment because of an alleged counterclaim for damages, for some previous default of the vendor in another matter, may justify the vendor in rescinding. *Bradley v. King,* 44 Ill. 339. In *Rugg v. Moore,* 110 Pa. 236 (1 Atl. 320), the buyer of six carloads of corn refused to pay for the second carload (as he was bound to do), 'because he wanted to see if the vendor would ship all the corn purchased.' As he did not ship any more after receiving this word, the buyer sued for nondelivery; but it was held that the vendor was justified in refusing to send any more corn, and many cases were cited. A continued refusal or neglect to pay, by one who is pecuniarily irresponsible, and where evidently payment is of the essence of the contract, might well excuse the other party from continuing to send and so increase the indebtedness of the buyer. *Stewart v. Many,* 7 Ill. App. 508, furnishes an excellent illustration. See, also, *Reybold v. Voorhees,* 30 Pa. 116; *Branch v. Palmer,* 65 Ga. 210; *Landeche v. Sarpy,* 37 La. Ann. 835; *Dwinel v. Howard,* 30 Me. 258; *Robson v. Bohn,* 27 Minn. 333 (7 N. W. 357); *Florence Milling Co. v. Brown,* 124 U. S. 385 (8 Sup. Ct. 531, 31 L. Ed. 424), where the buyer became insolvent, and unable to pay for the prior installment. A refusal to pay, accompanied by a refusal to receive and accept any more goods, even if tendered according to the contract, would be still more satisfactory evidence of a repudiation or abandonment of a contract, and authorize the vendor to treat it as no longer binding on him. See *Fletcher v. Cole,* 23 Vt. 114; *Haines v. Tucker,* 50 N. H. 309."

In *Blackburn v. Reilly,* 47 N. J. Law, 290 (1 Atl. 27, 54 Am. Rep. 159), it is said:

The other question discussed on the argument was whether the defendant had the right to refuse to receive any more bark in case he could satisfy the jury that the five loads of bark delivered were not equal in quality to the requirements of the contract. The contract provided that the plaintiff should deliver and the defendant should receive, one carload of bark weekly for a year at $18 a

ton, payable on delivery.    It belongs to a class of agree-
ments sometimes called 'continuing contracts of sale,' be-
cause they are to be completely performed, not by single
acts of delivery and payment, but by a series of such
acts at stated intervals.    The rule to be applied in de-
termining whether the express obligations of such con-
tracts remain after one or more breaches by either party
has been the subject of much discussion of late years, and
has given rise to some contrariety of judicial opinion.
We do not feel constrained by the phases of the present
case to enter at any length upon the details of this dis-
cussion.    In our opinion the rule established in England by
the judgment of the House of Lords in *Mersey Steel &
Iron Co. v. Naylor,* 9 App. Cas. 434, affirming the judg-
ment of the Court of Appeals in s. c. 9 Q. B. Div. 648,
is one which in ordinary contracts of this nature will work
out results more conformable to reason and justice.    The
rule is that defaults by one party in making particular
payments or deliveries will not release the other party from
his duty to make the other deliveries or payments stipu-
lated in the contract, unless the conduct of the party in
default be such as to evince an intention to abandon the
contract, or a design no longer to be bound by its terms.
This rule leaves the party complaining of a breach to re-
cover damages for his injury on the normal principle of
compensation, without allowing him the abnormal advan-
tage that might inure to him from an option to rescind the
bargain.    It also accords with the ancient doctrine laid
down by Sergeant Williams in his notes to *Pordage v.
Cole,* 1 Saund. 320b, that where a covenant (of the plain-
tiff) goes only to part of the consideration on both sides,
and a breach of such covenant may be paid for in dam-
ages, it is an independent covenant, and an action may be
maintained for a breach of the contract on the part of the
defendant without averring performance in the declaration.
It, of course, is inapplicable where the parties have ex-
pressed their intention to make performance of a stipula-
tion touching a part of the bargain a condition precedent
to the continuing obligation of the contract; and peculiar
cases might arise where the courts would infer such an
intention from the nature and circumstances of the bar-
gain itself—cases in which the courts would see that the

partial stipulation was so important, so went to the root of the matter (to use a phrase of Blackburn, J., in *Poussard v. Spiers,* 1 Q. B. Div. 410), as to make its performance a condition of the obligation to proceed in the contract.

Let us see how this rule squares with our own cases. It will be observed that our decisions follow those of Michigan and New Jersey, and, in the late cases from each of those states, the rule stated in the English sales act has been held to be the true one. For instance, in *West v. Bechtel, supra,* it is said: "The Supreme Court of New Jersey takes the same view of this question. *Trotter v. Heckscher,* 40 N. J. Eq. 612 (4 Atl. 83); *Blackburn v. Reilly,* 47 N. J. Law, 290 (1 Atl. 27, 54 Am. Rep. 159.). In the latter case the English and American authorities were considered, and the rule adopted in the *Mersey* case was approved." In the same case it is said, referring to our own case of *Myer v. Wheeler:* "The case of *Myer v. Wheeler,* 65 Iowa, 390, is closely analogous to the present case. Plaintiffs sold defendants ten carloads of barley. Defendants were to pay seventy cents per bushel for each carload, when delivered. On receipt of the first carload, the defendants refused to pay upon the ground that the barley was not equal to the sample, but stated that they had given plaintiffs credit for sixty-five cents per bushel, and would withhold payment until the ten carloads were delivered, and urged shipment of the remainder. It was held that this did not entitle the plaintiff to rescind the contract, and that he was liable for damages resulting from nondelivery of the remainder." See, also, *Burge v. Cedar Rapids & M. River R. Company,* 32 Iowa, 101. A valuable note upon this subject will be found in *Lake Shore & M. S. R. Co. v. Richards,* 152 Ill. 59 (38 N. E. 773, 30 L. R. A. 33).

It would be intolerable to hold that, if one party repudiates, renounces or abandons his contract, the other

may not treat the renunciation or repudiation as putting

**3. CONTRACTS: breach: subsequent offer to perform.** an end to it. Of course, the seller is not bound to treat the buyer's repudiation or renunciation as an end of the contract, for neither may as a general rule rescind without the assent, express or implied, from the other; but, if the renunciation is treated as a breach, the party renouncing is not at liberty to withdraw his renunciation and offer to perform the contract, although the time appointed for actual performance has not arrived. *Ault v: Dustin,* 100 Tenn. 366 (45 S. W. 981). As applied to ordinary executory contracts of sale, the rule of this court is that, if one party renounces the contract, the other may elect to treat it as broken and commence action at once. *Anderson v. Haskell,* 45 Iowa, 45; *Crabtree v. Messersmith,* 19 Iowa, 179; *Holloway v. Griffith,* 32 Iowa, 409; *McCormick v. Basal,* 46 Iowa, 235.

Appellee insists, however, that we are committed to the doctrine that, when goods are to be delivered and paid for in installments, the seller has no right to repudiate the contract because of the buyer's failure

**4. CONTRACTS: sale on installment plan: renunciation.** to pay for those already delivered. Generally speaking this is true. See: *Myer v. Wheeler,* 65 Iowa, 395; *Hansen v. Consumers' Heating Co.,* 73 Iowa, 77; *Osgood v. Bauder,* 75 Iowa, 550; *Timber Co. v. Windmill Co.,* 135 Iowa, 308. And it may safely be said that mere failure to pay, not evincing a purpose to renounce, is insufficient to justify the seller in treating the contract as abandoned; but if, from all the circumstances, it appears that the buyer intended to renounce and abandon the contract, the seller may then repudiate the same because of its breach by the buyer. See *Monarch Co. v. Wheel Co.,* 105 Fed. 324 (44 C. C. A. 523) and *West v. Bechtel, supra.*

Turning now to the cases upon which appellee relies, we find nothing running counter to what we believe to be

the correct rule. In *Hayden v. Reynolds,* 54 Iowa, 157, plaintiff entered into a contract whereby he, in consideration of certain notes, agreed to sell and deliver two horses and nine and one-half tons of hay. He delivered one horse and received the notes with the understanding that the same were to be indorsed by defendant. Defendant refused to indorse. Plaintiff then offered to deliver the other horse and hay upon defendant's indorsing the notes. Defendant refused to indorse, and plaintiff rescinded and brought action to recover the value of the horse delivered. It was held that plaintiff was justified in rescinding, and that he was entitled to recover. In *Myer v. Wheeler,* 65 Iowa, 390, plaintiffs sold defendants ten carloads of barley, by sample, to be delivered in installments; defendants to pay seventy cents per bushel for each carload when delivered. Upon receipt of the first carload defendants refused to pay because not answering to sample, but informed plaintiff they would give credit at sixty-five cents per bushel and would withhold payment until the other nine carloads were delivered. They also urged defendants to ship the remainder of the barley and promised to honor their drafts for future shipments. Plaintiffs refused to ship any more barley on the terms proposed, but offered to continue if the first carload was paid for. . Action was brought for the price of the first carload. Plaintiffs were held entitled to the value of the first carload, and defendants to damages for plaintiffs' failure to deliver the other nine cars. As a basis for this decision the court said:

Defendants were not in default as to the unexecuted portions of the contract. Nor did it appear that they ever would be in default as to them. They expressed a willingness to pay for the other nine carloads as they should be delivered, and there is no claim that they were not able to perform their undertaking in that regard. They did not refuse absolutely to pay for the carload which was delivered, but claimed the right to retain the price until the others should be delivered, and as security for the per-

formance of the contract by plaintiffs. It was not understood when the parties entered into the contract that plaintiffs were dependent for the means to purchase the subsequent carloads on the money which they would obtain for those first delivered. Nor is it shown that they were so dependent. We think therefore that the circuit court rightfully held that plaintiffs were liable for the damages occasioned by their failure to deliver the remaining carloads. The rule established by the decided weight of authority, both in England and in this country, is that rescission of a divisible contract will not be allowed for a breach thereof, unless such breach goes to the whole of the consideration. *Freeth v. Burr,* L. R. 9 C. P. 208; *Mersey Steel & Iron Works v. Naylor,* L. R. 9 Q. B. Div. 648; *Simpson v. Crippin,* L. R. 8 Q. B. 14; *Newton v. Winchester,* 16 Gray (Mass.) 208; *Winchester v. Newton,* 2 Allen (Mass.) 492; *Sawyer v. Railway Co.,* 22 Wis. 403 (99 Am. Dec. 49); *Burge v. Cedar Rapids & M. R. Co.,* 32 Iowa, 101; *Hayden v. Reynolds,* 54 Iowa, 157. See, also, the collection of authorities on the subject in the note of Mr. Lucius S. Landreth to the case of *Norrington v. Wright,* 21 Am. Law Reg. 395.

It will be noted first that this case indorses the English rule announced in *Freeth v. Burr,* L. R. 9 C. P. 208, and also the rule of the Supreme Court of the United States as found in *Norrington v. Wright* (C. C.) 5 Fed. 768. It also approves of the rule in Wisconsin and Massachusetts.

The English rule as announced in *Hoare v. Rennie, supra,* is the one prevailing in Massachusetts. See *Stephenson v. Cady,* 117 Mass. 6. In this case it is said: "This is followed in the very recent case of *Bloomer v. Bernstein,* L. R. 9 C. P. 588, in which it is held that, where there is a contract for the sale of goods to be delivered by installments, the price of each installment being payable on delivery, and the buyer does not pay for one delivery under such circumstances as to give the seller reasonable ground for believing that he will be unable to

pay for the future deliveries, and that he does not intend
to go on with the contract, the seller is justified in re-
pudiating it. See, also: *Fletcher v. Cole,* 23 Vt. 114;
*Webb v. Stone,* 4 Fost. (N. H.) 282; *Winchester v. New-*
*ton,* 2 Allen (Mass.) 492; *Star Glass Co. v. Morey,* 108
Mass. 570, 574." And, as we understand it, the Wiscon-
sin rule is the same. See *Sawyer v. R. R.,* 22 Wis. 403
(99 Am. Dec. 49).

Going back to *Myer v. Wheeler,* it will be noted that
defendants had not refused to pay for the carload which
had been delivered, that they expressed a willingness to
pay for the other nine loads, and that they were at
all times demanding the performance of the contract.
This clearly brought the case within the English rule,
for there was nothing to indicate a renunciation or
abandonment of the contract by the defendants in that
case. In *Hansen v. Heating Co.,* 73 Iowa, 77, plaintiff
agreed to furnish defendant at a certain price all the coal
it would need for the season; the coal furnished during
any month to be paid for on the 10th of the month follow-
ing. It was held that plaintiffs could not declare the con-
tract at an end upon a failure of the defendant to pay at
the time agreed and recover the market value instead of
the contract price for coal delivered, after notifying de-
fendant that they regarded the contract as rescinded.
*Myer v. Wheeler* was followed. In that case there was no
evidence of any abandonment or renunciation of the con-
tract by the defendants, and plaintiffs shipped the coal as
promised. This does not run counter to the modern Eng-
lish rule. In *Osgood v. Bauder,* 75 Iowa, 550, there was
a contract for the shipment of coal to be delivered and
paid for in installments. It was there said:

The plaintiff alleged in his petition that the coal com-
pany was released from all obligation to ship more cars
of coal than it did, for the reason that defendants failed

to pay for the coal shipped within the time and in the manner provided by the contract. He now complains of rulings of the court which excluded evidence offered to sustain that issue. We discover no error in these rulings. The agreement provided for the payment for each shipment thirty days after it was made. The alleged breach did not go to the whole consideration of the contract, and the coal company did not therefore have the power to rescind the contract. *Hansen v. Consumers' Steam Heating Co.,* 73 Iowa, 77; *Myer v. Wheeler,* 65 Iowa, 395.

The general principle there announced is sound. The facts are not very clearly set out; but there was no intent to depart from the rule of the cases cited. *Timber Co. v. Windmill Co.,* 135 Iowa, 308, is not in point; but we may with profit quote from that opinion the following:

As a general rule, it may be said that a contract is entire, when by its terms, nature, and purpose it contemplates and intends that each and all of its parts and the consideration shall be common each to the other and interdependent. On the other hand, it is the general rule that a severable contract is one in its nature and purpose susceptible of division and apportionment. The question whether a given contract is entire or separable is very largely one of intention, which intention is to be determined from the language the parties have used and the subject-matter of the agreement. The divisibility of the subject-matter or the consideration is not necessarily conclusive, though of aid, in arriving at the intention. Where it reasonably appears from the language of the contract or from its terms that the parties intended that a full and complete performance should be made with reference to the subject-matter of the contract by one party in consideration of the obligation of the other party to the contract, it is said to be entire. It is very difficult to lay down a rule which will apply to all cases, and consequently each case must depend very largely upon the terms of the contract involved.

Looking back now to the contract in this case and to

the conduct of the parties, we think it clearly appears that the parties regarded the contract at an end, that Clarke renounced the same, and that defendant re-scinded it because of this renunciation and abandonment, as it had a right to do. No demand was ever made by Clarke that defendant furnish the subsequent volumes, and he never paid, or offered to pay, the amount due on his contract, although frequent demands were made upon him to do so. We do not know what better evidence could be produced to show an abandonment and renunciation of the contract than here appears. The case is ruled by *Hoare v. Rennie, Norrington v. Wright,* and other like decisions. Moreover, it appears that on November 11, 1904, defendants notified Clarke that they considered his contract null and void because of his failure to pay or to make any response to their letters, and on that day wrote upon the contract that it was cancelled. Clarke made no objection to this, made no demand for the books then due him had he performed his contract, or that any be sent him in the future. In fact, nothing was done by him until more than two years thereafter, when Clarke assigned the contract to plaintiff, and plaintiff paid for the volumes already delivered, in Clarke's name. We do not regard the payment for books already received by Clarke as a material circumstance in the case. Conceding that the contract was rescinded insofar as it related to future deliveries, Clarke still had the books which he had ordered, and he was indebted for the purchase price thereof, whether the contract was continued or not. We are constrained to hold that Clarke, by reason of his conduct after notice of the cancellation, is estopped from insisting upon the validity or continuance of the contract. See, as sustaining this view, *McDermid v. McGregor,* 21 Minn. 111, wherein it is said:

5. SAME: abandonment of contract: cancellation: estoppel: specific performance.

The facts clearly establish gross negligence on the side of the plaintiff, both in executing his part of the contract, and in applying for relief. Save so far as the possession of the premises might, during its continuance, operate to qualify the effect of the long default in making payment of the purchase price, this negligence, is unexplained by any equitable circumstance. As to the long-continued failure to make payment, the case is one in which (although time may not have been the essence of the contract) it is eminently proper for a court of equity to have regard to time as it respects the good faith and diligence of the plaintiff. As to the failure to apply sooner for relief, the rule is that where, as in this instance, one party to the contract gives notice to the other that he will not perform it, acquiescence in this by the other party (not being in possession), by a comparatively brief delay in enforcing his right by an appeal to the courts, will be a bar.

See, also: *McCabe v. Matthews,* 155 U. S. 550 (15 Sup. Ct. 190, 39 L. Ed. 256); *Wolf v. Power Co.,* 15 Mont. 49 (38 Pac. 115); *Harrigan v. Smith* (N. J. Ch.) 40 Atl. 13; *Mahon v. Leech,* 11 N. D. 181 (90 N. W. 807); *Gish's Ex'r v. Jamison,* 96 Va. 312 (31 S. E. 521); *Simpson v. Atkinson,* 39 Minn. 238 (39 N. W. 323).

It must be remembered at all times that this is a suit in equity for specific performance, and that such relief is not granted as a matter of right. If Clarke were here asking for specific performance, he would not be granted relief without paying the installments due and showing some excuse for non-performance of his part of the agreement. His conduct was such as to cause a chancellor to deny him specific performance. He did not pay for what he had, he accepted without protest defendant's notice of cancellation, and neither he nor his assignee demanded performance until defendant had increased the price of its books. It appears that some profit would result if performance were granted. Plaintiff can still obtain the property, but he must pay a higher price. If he and his assignee had met the terms of the contract as promised, they might

have obtained them for less; but for five years they held some of defendant's property without paying for it, and are now insisting upon the performance of a contract which defendant had good reason to believe was abandoned, when it rescinded and canceled it. The acts and conduct of all the parties indicated an intent no longer to be bound by the contract, and we think it was rescinded.

For the reasons pointed out, the judgment must be, and is, *reversed*.